The final case is U.S. v. Holmes. This is the consolidated matter. Good morning, Your Honors. Patrick Luby of Williams & Connolly. I represent Defendant Appellant Elizabeth Holmes, and I'll be presenting argument on behalf of defendants from their consolidated appeal from the Court's restitution order. And I'd like to reserve two minutes of my time for rebuttal. All right. May it please the Court, this Court should vacate the restitution order because it is contrary to loss causation principles this Court has long applied in cases involving investments in legitimate companies. In these cases, loss is limited to the depreciation and share value that is directly and proximately caused by the defendant's conduct. On this record, the correct loss amount is far less than the investor's total investments as two undisturbed factual findings below make plain. First, the District Court found that Theranos had considerable value apart from the alleged fraud. There is no dispute that that value, which we call intrinsic value in our briefing and in the cases, which was comprised of hundreds of millions of dollars in the company's bank account, an IP portfolio worth over $700 million, that it continued to exist long after the alleged fraud was revealed. The second factual finding is the Court's finding that the government did not prove that the offense conduct caused the company to collapse in 2018, which is the event that precluded certain investors from realizing all of the company's inherent value. The District Court made these factual findings at sentencing and it did not revisit them at restitution. Instead, it avoided them by making two fundamental legal errors. First, the Court held that the proximate cause inquiry at restitution is limited to the decision to invest, but that is incorrect. The proximate cause test under the MDRA applies to the loss amount as well. Second, the Court reasoned that deducting for the company's intrinsic value at sentencing was required under guidelines provisions relating to credits against loss, but that's wrong too. It's the loss causation principles that this Court has articulated in cases like Zolp, like Lorienti, and Berger that required accounting for the company's intrinsic value at sentencing as part of an initial loss calculation, not as a credit for property returned. I'm not sure I understand your argument here. Did Theranos have any business other than blood testing? It had the blood testing services that it ran out of Walgreens. That was its main commercial. It also had business with the Department of Defense. Right, but it all related to its business of testing. Correct. And in developing that technology, it accumulated a patent portfolio that covered various aspects. It also developed software technologies and other inventions that surrounded the testing services, such as the NanoTainer and other proprietary technologies. And these technologies had real value that were independent of the alleged fraud. And even according to the government's own expert, a full 70% of the company's value as of December 31st, 2014, was non-fraudulent. So these two legal errors below led the Court to award restitution. After the fraud came to light, were the investors able to liquidate their shares for any value? The investors who still held their shares in 2018, Your Honor, no, were not able to liquidate their shares. Right, the District Court made that factual finding, right? No, Your Honor. The Court's statement at 1 ER 27 is not a factual finding that there was no secondary market for Theranos shares or that it was impossible to sell shares. The Court did not make that finding, and it could not have, because the fact of the existence of a secondary market for Theranos shares was a matter of public record, and that's in the Coleman decision that we cite in our reply brief. And the fact that that statement in the Court's order is not a factual finding is also clear from the context for several reasons. The first of which is that it appears in the conclusion paragraph of the relevant portion of the order, and the sentence in which it appears is merely a restatement of its holding under Roebers that restitution must be the initial loss amount, lest any money obtained from selling shares. The Court was merely observing that the 14 investor victims awarded restitution, in fact, did not sell their shares. Second, the Court's order says nothing about whether or not there was a secondary market. He didn't say they didn't sell the shares. He said they were unable to liquidate the shares. He says, yes, Your Honor. He says that they were not able. But the Court did not hear evidence or make an independent factual finding that a secondary market did not exist, for the reasons already stated, that Court could not have made that finding. But to be clear, defendant's argument does not rest on the existence of a secondary market. The loss causation principles that this Court has articulated in Zolp and that line of cases, they require isolating for the company's intrinsic value, because that intrinsic value is, by definition, not something the investors ever lose to fraud. And that is true whether or not the investors have an opportunity to liquidate their shares, because there's an investment in a private company. It's, of course, true that private companies can hold incredible intrinsic value apart from their alleged fraud. If the Court were to affirm the District Court's order, it would open a direct split with the Second Circuit, which has held that Zolp's sensible loss causation rules apply equally to restitution and sentencing. The District Court here provided no compelling reason why Zolp should apply at sentencing, but not restitution, in the very same case on the very same record. The proposition makes no sense, and the government barely defends it as a matter of logic. Indeed, the government's arguments on appeal only confuse these basic points. First, the government overreads Robers v. United States. Robers was, at bottom, not a loss causation case. The amount and cause of the loss was undisputed, and that's why the Court's analysis of the statute was contained to the portion of the statute that concerns valuing for property returned. That provision is not at issue here. Second, the government misconstrues this Court's restitution precedents. None of the cases the government cites involve investment loss. And to be clear, and contrary to the government's suggestion, this Court has never held that Zolp does not apply to restitution. In fact, in at least two instances, in Geringer and the Lorienti case, this Court has vacated a sentence for failure to apply Zolp, and has also vacated the restitution orders that are premised on the same erroneous loss causation calculations, strongly suggesting, if not holding, that Zolp should logically apply in both contexts. I'd like to address the government's fallback position, as well, that the government urges a carve-out for Zolp for private companies. The government cites no case for this carve-out, which the Second Circuit in the Leonard case and the district court below rejected. The proposed carve-out is logical, as I was saying earlier in response to Your Honor's questions. It's not just public companies that can have value. Private companies, of course, can have immense value. And the government's rec — this argument rests on a premise that the record conclusively refutes. That investors had a way to mitigate losses after October 2015. We already talked about the existence of the secondary market as evidenced in the Coleman decision, but that was also borne out in trial, in both trials. There was trial testimony about the existence of a secondary market on websites such as SharesPost, and Ms. Elaine LePera submitted a victim impact statement in which she said that she had purchased her shares from her boss and then later resold them to a third party. So there were avenues to sell shares. And the government's argument also overlooks the other ways in which investor victims had opportunities to mitigate their loss, including in 2017 when the investors — certain investors that were awarded restitution negotiated for a new class of shares with the in other concessions, evidencing a continued interest to invest in Theranos. Would you like to save a little bit of time for rebuttal? Yes, I would, Your Honor. Thank you. It's quite a morning for you. May it please the Court, Kelly Volkar on behalf of the United States again, Your Honors. Thank you. This Court should affirm the District Court's restitution order because the District Court did not err, let alone abuse its discretion, by ordering the restitution amount of the actual losses that Holmes and Balwani's fraud approximately caused to 14 investor victims. On appeal, Holmes and Balwani are asking this Court to read a requirement into the restitution statute that isn't there. Well, on the actual value, the Court has to take into account whether there's any residual value. Did the District Court engage in that analysis? It did, Your Honor, and this is where the plain language of the MDRA is instructive here. There's nothing in the plain language that indicates, well, first of all, to back up, the government's position following Roeber's is that the property that was lost was the money, and the District Court found that this was a fraud in the inducement case, that the misrepresentations are what caused the investors to part with that money, and so because this is a fraud in the inducement case, the property that was lost, the investors had shares in hand. Those shares were ultimately worthless, and they were unable to liquidate those. And to challenge my colleague across the aisle's position a moment ago that it was not a factual finding of the District Court, the District Court did make a factual finding that the investors were not able to liquidate their shares, and that is at 1ER27. The District Court in its offset value to the restitution amount, as defendants were asking for, said that other than certain undisputed amounts returned, none of the investor victims' lost property were returned, nor were any of the victims able to liquidate their shares, and that was the truth. And so when we look at the MDRA, the plain text of the statute tells the Court what it is supposed to do, and that is exactly what Judge Davila did in reaching his decision on the restitution. The Court is to look at whether or not property was returned. In some instances, there was amounts of property returned via civil settlements. Other than that, if the property is not returned, the Court is to look at the greater of the value of the property, either on the date of the loss—here, Judge Davila found that the loss was the date that the investments were fraudulently induced—less any value, any part of that property that is returned. So if there were an opportunity for the victims to sell their shares, which again, indisputably, there was not, then that would fall under that second half of the statutory text and would be able to offset it in that manner. My colleague across the aisle ended by pointing to there were avenues to sell the shares. The record does not support that and does not show that Judge Davila's finding was clearly erroneous. The reason being, most of the instances my colleague points to were before the Wall Street Journal article in October of 2015, and all of them were before the CMS report came out. So really, all of the incidents they point to were before the fraud was revealed, and the incidents they do point to are also telling. They point to one victim who bought shares from her boss, Don Lucas, who was a board transaction. Also, the district court specifically found that Eileen LaPera, the person they're referring to, was not a victim for purposes of the restitution award, despite the government seeking that on her behalf. The second thing they point to is one investor selling another investor shares in December, I believe. And the last thing they point to is one additional investment made after the Wall Street Journal article and Holmes' self-serving statements that before the revealed she had had people ask to buy her shares in the company. In sum, this is the case where the district court reviewed the plain language and the purpose of the MVRA, looked to the court's instructive ruling in Rovers, found that the money lent by the investors when they were fraudulently induced based on misrepresentations was the property at issue. And so the only offset that the defendants were entitled to was any money that was returned. And again, for certain investors there were some civil settlements and that money was offset. But other than that, there's no basis in this court's case law or in the text of the MVRA to reduce the amount by an artificial value into the It really is the fact that there's no residual value left, right? That drives the analysis in this particular case, not the fact that there's no offset at all. If there were residual value, then the government's argument really wouldn't work. Your Honor, the government's position is that the statute allows for an analysis in that manner as well, and Justice Sotomayor's concurrence in the statute allows compensation in the amount of actual losses. It doesn't allow any windfall. So the extent that the value of the residual value is high, that's not the case in this particular case, I can tell from the record. But if you have a case where the residual value is high, then the court would have to do the offset, wouldn't they? Your Honor, I think the offset would be, and this court in Gagarin held that it's permissible to put the burden of proving a statutory offset on the defendants, which the district court, I believe, did so here in citing Gagarin. However, in that case, I think there would still need to be proof that there was, if there was residual value, that the victims could somehow recoup that. And that was my reference to Justice Sotomayor. Isn't that actually the definition of residual value? I mean, if you can't recoup it, it's not really residual value, it seems. That's correct, Your Honor, and that's why I think a lot of the cases that my colleague across the aisle points to are in the context of public companies. And in the context of public companies, of course, we have a stock exchange, and if you have stock and there's, a fraud is revealed, but there's still some residual value left, you have a basis to go sell that stock. And there's an easier way to do an offset. So I think, you know, it is the combination here that this was both a private company, but also a private company with illiquid shares and no opportunity for the victims to recoup that cost. So regardless of whether or not there. Should we take that into account that the victims should have known that it was going to be more illiquid, so therefore we should apply a different test than in a private company closely, well, I don't know if I should say closely held, but where they're not illiquid as opposed to on the stock market, does that enter into the equation of the restitution? I think it should, Your Honor, and I would point the court towards two reasons. One is Justice Sotomayor's concurrence. Well, I was actually going a different way. I'm surprised you agreed with me because I was actually going to say that the victims shouldn't be entitled to as much restitution because they knew that they had more illiquid stock than they would in a public company. So therefore, their reliance interest was different. Your Honor, pardon me if I'm misunderstanding. Well, maybe you didn't. Maybe you agree with me. I don't know. I apologize. I am worried that I'm misunderstanding the court's question. I would want to pivot back to this court's decision in Gossie, which talked about property and the idea of what is property is when the victim has the power to dispose of that property. And so that is where I think that illiquidity can come into play here because these victims never had the power to dispose of the property to get any value back. And therefore, the actual loss is the amount that they invested and lost. And the district court did not abuse its discretion in reaching that conclusion. If this court has no further questions, we ask that the court affirmed. Thank you, Counsel. Thank you, Your Honors. There was residual value in the company after the alleged fraud was revealed in October 2015. The hundreds of millions of dollars in the company's bank account, the patent portfolio worth upwards of $700 million in potential licensing opportunities, these things did not occur. The fact that investors may have had difficulty in selling their shares is not owing to the fraud and is not traceable to the proximate cost requirement under the MVRA. It's just the nature of the investment in investing in a private company. But private companies can have immense value. This court and Zolp in the Second Circuit line of cases adopting the similar reasoning do not make this distinction that the government suggests. In fact, they recognize the opposite of the government's position, that the impaired value here is the share value in Theranos. To be sure, the investors invested money, but they purchased equity with that money. It was that property interest in Theranos that was impaired by the alleged revelation of the fraud. But Zolp instructs that when after the revelation of the fraud, there's still immense value, which the government does not dispute. Its own expert estimated the company to be worth upwards of $1 billion in October of 2015. Zolp requires accounting for that residual value as part of the proximate cause inquiry. And I'd like to just speak briefly about the record evidence on the existence of the secondary market, which to be clear, the defendant's argument does not rise or fall. But the government cites no evidence regarding the inability of investors to sell their shares. The I invite the court to review those portions of the supplemental excerpts because they do not establish that fact, which goes a long way of explaining why the district court did not find that fact in its opinion. It just merely noted that the investors who held their shares had not been able to sell their shares. Not that it was impossible, but merely that they continued to hold that equity at that time. Thank you, Your Honors. Thank you very much, counsel, both sides for your argument this morning. The recess until tomorrow morning.
judges: SCHROEDER, NGUYEN, NELSON